2022 IL App (2d) 200472-U
No. 2-20-0472
Order filed May 6, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Du Page County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 11-CF-1764 |
| CHAUNTEL L. TIMS, | ) ) ) | Honorable John J. Kinsella, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE HUDSON delivered the judgment of the court.
Presiding Justice Bridges and Justice Hutchinson concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court did not err in its second-stage dismissal of defendant's postconviction petition claiming that defense counsel was ineffective for failing to call, at defendant's trial on stalking charges, a sheriff's deputy to testify that the victim told the deputy that she let defendant into her home during one of the charged incidents. Defendant's petition failed to make a substantial showing of a constitutional violation because (1) he failed to provide documentation to support his claim and (2) he could show no prejudice from the omitted testimony.

¶ 2    After a bench trial, defendant, Chauntel L. Tims, was convicted of two counts of stalking (720 ILCS 5/12-7.3(a)(2) (West 2010)). The trial court merged the second count into the first and sentenced defendant to five years' imprisonment. On direct appeal, we affirmed. *People v. Tims*,

2013 IL App (2d) 120096-U. In 2014, defendant petitioned for relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2012)). The trial court advanced the petition to the second stage and appointed counsel for defendant. The court granted the State's motion to dismiss the petition. Defendant appealed. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      The indictment against defendant alleged that (1) he caused A.S. emotional distress and (2) he caused her to fear for her safety. Both counts were based on four alleged acts. First, on or about May 31, 2011, defendant entered A.S.'s apartment and refused to leave. Second, on or about June 2, 2011, he knocked on her patio door and attempted to open it. Third, on or about June 7, 2011, he left a sexually explicit message on her patio. Fourth, on or about July 31, 2011, he stared at A.S. for approximately five minutes while she was outside and repeated this conduct twice.

¶ 5      At trial, A.S. testified on direct examination as follows. At all pertinent times, she resided alone in a first-floor unit in a condominium complex in Willowbrook. A sliding glass door separated her living room and patio. By May 2011, A.S. had become acquainted with defendant, as he sometimes walked by while she was on the patio and attempted to strike up conversations. Early in May, he told her that he liked her place, and he offered to help her clean it. She said no and went inside. Several other times, defendant tried to talk with A.S.; she told him to leave her alone, and he walked away.

¶ 6      A.S. testified that, one evening about two weeks before May 31, 2011, she was sitting on her patio. Defendant walked up and asked to use her bathroom. A.S. said no, but he opened the glass door and walked inside. A.S. was frightened and screamed for help. A family that lived in the complex walked by but did not help. A.S. ran into her living room and grabbed her phone from the wall socket near her couch. She could not see defendant at that point.

¶ 7    A.S. testified that, as she bent down to get her phone, she felt a push in her back. She looked back and saw defendant. He pushed her onto the couch. A.S. was terrified. As she lay on her stomach, he sat on the couch, unzipped his pants, and pushed her head onto his penis. She acquiesced out of fright. Defendant eventually ejaculated, said that he was finished, and let go. A.S. ran into her bathroom and locked herself inside for two hours. During that time, she threw up and took a shower. She thought of calling the police but was too "embarrassed and mortified and grossed out" to do it. The attack left her afraid to sit on her patio, keep her windows open at night, or walk at night from her car to her home.

¶ 8    A.S. testified that, on the evening of May 31, 2011, she was in her kitchen when defendant knocked on the sliding glass door and asked to use her bathroom. She said no, but he opened the door, entered, and walked by her. He was carrying a McDonald's bag and a camera. A.S. screamed at him to get out and said that she would call the police. She took her phone and went outside. Defendant was sitting on her couch. As A.S. called the police, he walked out. When a police officer arrived, A.S. told him what happened that day but not about the assault earlier that month. He said that she could press charges and have defendant arrested, but he would probably get out the next day. A.S. elected instead to have the police warn defendant.

¶ 9    A.S. testified that, at about 9 p.m. on June 2, 2011, she was inside when she heard a knock on the sliding door. She saw defendant pulling on the door. After the prior incident, A.S. had made sure that the door was locked, but defendant shook it to jar it open. A.S. went to her bedroom and called the police. When she returned, defendant was not there. The police arrived and said they would speak to defendant again; if he did anything more, he would be arrested.

¶ 10   A.S. testified that, between mid-June and mid-July 2011, she was on vacation overseas. On June 7, 2011, while she was still at home, she heard a knock on the glass door. She saw nobody

out there. About an hour later, she went onto the patio and saw a card, flowers, and a candle. The sight "just really creeped [her] out." She threw out the candle and flowers, carried the card inside, and read it. She did not call the police that evening. The next day, on the advice of her boss at the school where she taught, A.S. made two copies of the card and gave one to her condominium association, which had spoken with defendant and his mother a few days earlier. That evening, she spoke with the police and handed them the other copy of the card. They told her that, to pursue the matter, she would have to testify in court. As A.S. was leaving for vacation in two days, she decided to take care of the matter when she returned. A friend house-sat while she was gone.

¶ 11     A.S. identified the copy of the card that she had given to the police. It read:

"  'Dear Friend, as I sit here, I can't help to notice that it's not what I thought. Only if I could turn back the hands of time, things could be much better. Fast friend end fast [*sic*], so I am sending you flowers for growth and a candle for what we have. I am lost with words [*sic*] to explain how you make me feel—sluttish, super hard, etc. Go, but don't go. Go, but don't go.' "

¶ 12     A.S. testified that, after she returned from her vacation, things were quiet for a while. The condominium association had warned defendant's mother that he was not to go near A.S.'s residence. However, on July 31, 2011, during the afternoon or early evening, A.S. was sitting on her patio when she saw defendant pacing around a cul-de-sac about 30 feet away. He went inside and came back out. This time, he was "staring at [A.S.] with his hands in the air, kind of shaking them." He kept this position for perhaps five minutes. This happened "three times" within "maybe an hour." The first time, defendant just paced around the cul-de-sac. The second and third times, his legs were spread apart. After the third time, A.S. called the police and signed a complaint.

¶ 13    A.S. testified that defendant's actions between May 31 and July 31, 2021, made her nervous all the time. She was put on anti-anxiety medicine, missed work, and was fired from her job. In October 2011, while driving to an interview at the State's Attorney's office, she blacked out and got into a serious accident. A.S. had told her boss about the mid-May assault, and, at the State's Attorney's office, she informed the prosecutors of the assault.

¶ 14    A.S. testified that at no time did she have any type of romantic involvement with defendant or any consensual sexual encounter with him.

¶ 15    A.S. testified on cross-examination as follows. During the sexual assault, defendant's left hand was on her back as he used his right hand to unzip his pants. He was in front of her face, and, after he finished, he remained on the couch. He did not stop her from getting up and running to the bathroom. A.S. did not get any sleep that night.

¶ 16    A.S. testified that, on May 31, 2011, defendant entered her apartment, carrying a camera and a McDonald's bag. He went to the bathroom and left the camera there, where the police found it later. On June 2, 2011, A.S. did not tell the police about the sexual assault; she could not recall whether she told them about her earlier encounters with defendant. On June 7, 2011, A.S. waited an hour after the knock and then went out on the patio, where she discovered the card, flowers, and candle. The next day, she notified the police. A.S. did not tell the officer who responded about either the sexual assault or her earlier encounters with defendant. On July 31, 2011, A.S. did not tell the police about the sexual assault; she did not recall whether she told them about the earlier encounters.

¶ 17    Phil Marotta, a Du Page County deputy sheriff, testified that, on June 2, 2011, shortly after 9:30 p.m., he and another deputy spoke to A.S. at her home for 10 or 15 minutes. She was visibly shaken. A.S. told the deputies that she wanted defendant to leave her alone. She declined to sign

a complaint but asked the deputies to warn him. A.S. told them about the May 31, 2011, incident but not about the sexual assault or preceding encounters with defendant. Defendant's building was southwest of A.S.'s building, but his apartment was not visible from her patio. At defendant's apartment, the deputies told him that he was not allowed to go to A.S.'s residence or to talk to her. Defendant "kind of shrugged it off and laughed." He denied having gone anywhere near A.S.'s apartment. He was obviously intoxicated.

¶ 18　Mary Addison, a corporal with the Du Page County sheriff's department, testified on direct examination as follows. On June 8, 2011, she spoke to A.S. at her apartment. A.S. appeared upset and frustrated. She handed Addison a copy of the card that she had found on her patio. A.S. pointed to defendant's building and told Addison which apartment he lived in. Addison went there, but defendant was not home. The next day, she returned and spoke with defendant. He admitted that he had left the card, candle, and flowers on A.S.'s patio and that other officers had told him not to have contact with A.S. Defendant told Addison that the card was his apology to A.S. Addison responded that she did not believe that "telling somebody that they make your dick hard is a way of apologizing." Defendant said that he would have no further contact with A.S. During the conversation, he never said that he had a relationship with A.S.

¶ 19　Addison testified that, on July 31, 2011, she and another deputy went to A.S.'s residence. A.S. was crying and seemed very scared. She spoke about an encounter with defendant. The deputies went to defendant's apartment and arrested him. He showed symptoms of intoxication.

¶ 20　Addison testified on cross-examination as follows. The day after the card incident, A.S. told her that she saw defendant place the card and other items on the patio. A.S. said that, after defendant walked away, she threw out the flowers and the candle. A.S. gave Addison a copy of

the card but insisted on keeping the original at that time. Addison encouraged her to seek a stalking/no-contact order, but she had not heard that any such order had been issued.

¶ 21    Addison testified that she did not recall what time on July 31, 2011, she went to A.S.'s residence. The interview occurred sometime in the afternoon, before Addison's shift at 6 p.m. That day, as best Addison could recall, A.S. told her that she saw defendant exit his apartment (not merely his building). Asked whether A.S. could have seen defendant's apartment from hers, Addison testified that "[if] you look at [defendant's] back sliding windows," A.S.'s apartment was visible. A.S. told Addison that defendant walked down the sidewalk, stood with his arms and legs out for five minutes, and then returned to his apartment. She said that he did so three times. Addison looked toward defendant's building but could not see any parties or barbecues going on.

¶ 22    Peter Klockars, a Du Page County sheriff's deputy, testified on direct examination as follows. On May 31, 2011, he was dispatched to the complex, outside A.S.'s apartment. Deputy Zeigler (first name not given) was already there, standing next to defendant. Defendant was holding a McDonald's bag. He had an odor of alcohol and slurred speech. Zeigler left to talk to A.S. and returned five minutes later, carrying a camera. Zeigler asked defendant about the incident with A.S. Defendant appeared "fairly nonchalant" and explained that he had gone to A.S.'s residence because "they were friends." The deputies warned him to have no contact with A.S. and not to return to her apartment. Defendant returned to his apartment. Klockars and Zeigler then spoke to A.S. in her apartment. She was shaken up and appeared scared. She was hesitant to speak about the incident and did not want to pursue charges against defendant.

¶ 23    Klockars testified on cross-examination that A.S. reported that defendant had entered her residence and refused to leave. Defendant said that he and A.S. were friends, but he "kind of

impl[ied] there might have been a relationship." He did not say that he and A.S. had a sexual relationship, and Klockars did not inquire further.

¶ 24    Klockars testified that he never heard A.S. say that she had initially allowed defendant to enter her apartment.

¶ 25    The State rested. The trial court admitted the copy of defendant's card to A.S.

¶ 26    Defendant called Anthony Massie to testify. On direct examination, he testified as follows. He resided in defendant's building and was acquainted with him. He did not know A.S. On July 31, 2011, he had a birthday party and cookout, with about 50 people inside and directly outside his apartment. Defendant stopped by, "probably somewhere between 4 and 6 p.m." Defendant spent some time outside, on either Massie's patio or the sidewalk. Massie could not recall when defendant left, but it was probably between 6 and 7 p.m. He did not recall defendant at any time standing outside with his feet spread apart and both arms in the air.

¶ 27    Massie testified on cross-examination that he had no more than a half-hour of personal contact with defendant. Defendant left the party when the police arrived to talk to him. Massie did not see defendant for one to two hours before the police arrived, and he could not say what defendant had been doing during that period.

¶ 28    Defendant testified on direct examination as follows. The first time that he ever spoke to A.S. was "sometime [*sic*] the end of May [2011] maybe." Before the police contacted him, he had spoken with her once or twice. The first time, she was on her patio. He asked her for a cigarette, she gave him one, and he departed. Asked the date of the second encounter, defendant said, "I don't know when," but added that he "believe[d]" that it was in May during the evening. He was doing laundry and stepped outside to smoke. He approached A.S. and asked her for a cigarette.

She gave him one, then asked whether there was anything else that she could do for him. He said no and went back to his apartment.

¶ 29    Defendant testified that the third time he encountered A.S. was "around Mother's Day or just past Mother's Day," probably around 9 p.m. There was a party next door to A.S.'s unit and he spoke to some people there. Somebody asked him for jumper cables for a stalled car. A.S. was on her patio, so he asked her for jumper cables. She got some, he took them away, returned, and gave them back. He and A.S. got into a conversation. As A.S. walked to her apartment, she turned back around "to interview" him. They conversed for about half an hour. A.S. then said that she had to use her washroom, and she invited defendant inside. He accepted. A.S. went to the washroom, then entered the kitchen and emerged holding a banana. He made a joke about the banana, and they briefly kissed and had oral sex. A.S. then asked defendant whether he wanted to spend the night. He equivocated, and she fell asleep on his lap. He got up, exited the apartment, and locked the patio door.

¶ 30    Defendant testified that his fourth encounter with A.S. took place "sometime in June" at about 2 a.m. He could not recall whether it was "the beginning of June, middle of June, later on in June." He was outside the front of his building, smoking, and she was outside. She waved to him. He approached her, and she told him that her car had broken down. They conversed about the matter for about 30 minutes. Then, A.S. invited defendant inside. They made out on the couch and had oral sex. She then asked him whether he had any condoms, and he replied that he did not want to use a condom, because she was not his girl. A.S. was upset, but she asked him whether he wanted to spend the night. He said yes, and they spent the night in her bedroom. They did not have oral sex or intercourse. He left at about 9 a.m. Asked again what day of the week the encounter took place, defendant testified, "It was two days before she called 911."

¶ 31    Defendant testified that his next encounter with A.S. occurred two days later, after he came back from McDonald's. A.S. was sitting on her patio, and defendant stopped by. She started talking about her car, but defendant cut her short and said that he had to use the washroom. A.S. said nothing, and defendant used the washroom. When he came out, they spoke briefly, and she told him to leave. He did not want to leave, but she threw the McDonald's bag outside, so he had "no other choice but to leave." When he was outside, she told him that she was calling the police, so he returned to his apartment. When the police arrived, he told them that he had used the washroom and added, "I see [A.S.] on the weekends." They told him not to go to her apartment. This was the first time that the police had ever contacted him about his encounters with A.S.

¶ 32    Asked to describe A.S.'s bedroom, defendant testified that it had a bed, "fluffy stuff on top of her bed" and a dresser with a television on top. There were blinds, not curtains. Defendant remembered nothing else about the bedroom. When the deputies spoke to him after the incident with the McDonald's bag, he told Klockars that he saw her on weekends but did not think it was relevant to add that he "ma[de] out with her."

¶ 33    Asked when he next had contact with A.S., defendant testified, "I believe it was weeks or probably even a month later. No, it wasn't a month later. But it was weeks later." Asked the time of day, he testified, "It could have been around nine sometime." Defendant was wearing a "Halloween shirt." A.S. was watching television. He knocked on the patio door. She got up, saw his shirt, and sat down again. Defendant gathered that she wanted to be alone, so he went home, where the police were waiting for him. This was only his second contact with the police. Defendant admitted that he had visited A.S., and they reminded him that he was supposed to have no contact with her. The deputies took defendant to the front of his building. He saw A.S, who was accompanied by another deputy. A.S. pointed to defendant. Defendant then told the deputies

that he had a consensual relationship with A.S. One of the deputies told him that A.S. did not want to be bothered by him. Defendant responded, "[T]hat's fine by me."

¶ 34    Asked when he next encountered A.S., defendant testified that it was late in the evening either at the end of June or the beginning of July. Although the deputies had warned defendant to have no contact with A.S., his mother told him that he needed to work out his problems with her. Defendant told his mother that he had already been warned twice to stay away from A.S., but she persuaded him to go over and try giving A.S. a gift. Defendant took the card, candle, and flowers and walked over to A.S.'s residence. She was sitting on her patio, talking on her phone. Defendant walked up to her and set the gifts by her feet. She thanked him, and he started to walk away. He turned back around, and A.S. smiled and gave him a thumbs-up sign. Defendant left for work. The next day, Addison warned him that, if he had further contact with A.S., he would be arrested for stalking. She disbelieved his statement that the card was meant as an apology.

¶ 35    Defendant testified that, on July 30, 2011, in the evening, he was talking to a friend outside A.S.'s building, about 5 or 10 feet from A.S.'s patio, when A.S. came out onto the patio. The police arrived at defendant's building, and defendant asked A.S. why she was always calling the police about him. She shrugged to indicate that she was not the one who had called the police. Defendant left for home. On July 31, 2011, at about 1 p.m., Massie invited defendant to his party. Defendant went over at about 4 p.m. and started drinking at about 6 p.m. He was outside part of the time but went only as far as Massie's patio and the sidewalk. From where he was, he could not see A.S.'s apartment. He was never near the cul-de-sac and never performed the acts to which she had testified. Defendant went home at about 8 p.m. Soon, the police came and told him that he was under arrest for stalking.

¶ 36    On cross-examination, defendant testified that he and A.S. had consensual oral sex twice before she ever called the police. The first time was on Mother's Day of 2011. The prosecutor noted that Mother's Day was May 8, 2011, and he asked whether that was the correct date. Defendant responded that it could have been after Mother's Day, but he "kn[ew] it was around that time." The prosecutor then asked defendant whether the date was in the first week of May or perhaps the second week of May. Defendant responded, "I don't recall." A.S. was on her patio when a partier next door, whom defendant did not know, asked him to get jumper cables. After A.S. gave him the jumper cables and he returned them, they spoke for about 30 minutes about their jobs. A.S. then went inside, he followed and she went to the bathroom. After finishing, she went to the kitchen, grabbed a banana, and started "foreplaying [*sic*] with it."

¶ 37    Defendant testified that the second time he had consensual sex with A.S. before she ever called the police was in early June at about 2 a.m. The cross-examination continued:

"Q. Now, you heard Officer Klockars testify that he showed up and talked to you about an incident on May 31st of 2011. Do you remember that?

A. May 31st? I don't remember. But—

Q. You don't remember?

A. May 31st? What happened May 31st?

Q. Well, didn't you say that you did remember talking to Officer Klockars, and he told you to leave her alone?

A. Okay. I am confused. He—when did he talk to me? He talked to me on May 31st?

Q. Well, did you talk to Officer Klockars about leaving [A.S.] alone?

A. The only time I talked to a—the first time I talked to a police officer was when she called 911. That's the first—my first time ever talking to a police officer is when [A.S.] first called 911 on me.

Q. All right. Well, did you talk to Officer Klockars?

A. If that's his name on the day that [A.S.] called 911.

Q. So, *did she call 911 on May 31st of 2011*?

A. *If that's the date she called 911.*

Q. I am asking you. Did she?

A. *I am not certain.*" (Emphases added.)

¶ 38    Defendant reiterated that the second time that he had consensual oral sex with A.S. was in June. He testified again that they had consensual sex on two separate occasions before A.S. ever called the police. The cross-examination continued:

"Q. ***

So, you admit, on May 31st, you were in [A.S.'s] apartment. Is that accurate?

A. *May 31st? Is that the first time she called 911?*

Q. I am asking you do you recall an incident where you went in with a McDonald's bag and used the bathroom in her apartment and the police came and talked to you later that night?

A. *I don't recall.*

Q. You don't recall anything about that.

Did you testify a little bit earlier that you remember an incident where you had a McDonald's bag?

A. I know for a fact I went over there with a McDonald's bag." (Emphases added.)

¶ 39     Defendant testified that, on June 2, 2011, Marotta told him to leave A.S. alone.  Defendant did not tell Marotta that he and A.S. were in a relationship, because Marotta never asked him. Asked whether the incident with the card and gifts occurred while A.S. was overseas in late June or early in July, defendant testified that A.S. could not have been overseas, because he handed the card and gifts to her.  Defendant did not give the date of the incident, but it was "the day [A.S.] called the police, the day before."  He also admitted to having contact with A.S. on July 30, 2011.

¶ 40     Defendant rested.  In rebuttal, Klockars testified that, on May 31, 2011, he and Zeigler spoke to defendant and told him to have no contact with A.S.  Klockars did not hear defendant say that he and A.S. were having sex on weekends or that he saw her on weekends.

¶ 41     A.S. testified that she did not recall her neighbors having a party on or around May 8, 2011 (Mother's Day).  She was never approached by defendant about getting jumper cables.  Defendant was not in her apartment on or about May 8, 2011.  She had no car problems in late May or early June, and neither the 2 a.m. conversation nor the consensual oral sex ever took place.

¶ 42     The State rested.  After hearing arguments, the court found defendant guilty of both charges.  The court noted that witness credibility was crucial, and it provided the following explanation.  There was a factual dispute over whether the sexual encounter between A.S. and defendant in mid-May was consensual; although that incident was not a basis of either charge, it was important in deciding the credibility of the two principal witnesses.  Defendant's account of the incident was "in large measure incredible."  Defendant "appeared *** to often be making it up as he went along."  He could not recall "any dates, any specific times."

¶ 43     However, the court continued, even if defendant rightfully believed that he had had consensual sex with A.S., his further actions were still stalking as charged.  Even had A.S. consented at first, she had changed her mind by May 31, 2011.  The police told defendant no fewer

than four times that A.S. did not want to have contact with him and that they were ordering him not to contact her, yet he continued to do so. The card that he left was not an apology and, at any rate, he had no reason to contact her in any regard. Further, some of what defendant had said about A.S.'s conduct was incredible. Specifically, there was "absolutely no reason to believe" his story that A.S. took the note personally from defendant, gave him a smile and a thumbs-up sign, then called the police to report the incident and called the police again on July 31, 2011. "For [the court] to believe that, [A.S.'s] testimony would have to have been the most bizarre and schizophrenic act that this Court ha[d] ever seen."

¶ 44    As to the July 31, 2011, incident, Massie was a disinterested witness, but his testimony established that he had little contact with defendant and was not watching him for most of the time. Massie's testimony was simply inconclusive.

¶ 45    The court noted that A.S. had been inconsistent or impeached on some matters, such as whether, on July 31, 2011, defendant stood and waved his hands all three times that he came out or only two of the times. Also, a deputy incorrectly stated that defendant's apartment was visible from A.S.'s patio. The court continued:

"*But none of those points take away from the overall evidence in the case* that the defendant did engage in *** a course of conduct, series of acts which he knew—because he was told by the police no less—three times prior to his arrest, told by the police three times, that [A.S.] was calling them because she was concerned and she wanted him to stop contacting her, and he was causing distress to her.

And it was clearly manifested not only by her own testimony, but it was communicated to the defendant. *And there is no reasonable person who could conclude that somehow he had an ongoing relationship with her that he was trying to rekindle or—*

*and then to suggest that she was acting in one manner with regards to contacts with him and then completely opposite with the police.*

There is no basis in the testimony to believe that transpired. \*\*\*.

Whatever relationship existed between [A.S. and defendant] from the date of July 31st [*sic*], [defendant] knew \*\*\* she didn't want to have any dealings with him. *The testimony of the reaction of the victim is corroborated*, corroborated by the police[,] by their description of her acts, her statements, her descriptions, her emotional reaction to the situation." (Emphases added.)

¶ 46 The court found defendant guilty of both charges.

¶ 47 Defendant moved for a new trial. As pertinent here, his motion alleged in part that A.S.'s testimony was inconsistent with what she told the police. At the hearing on the motion, defendant's counsel stated, "I believe the first officer testified that he—she did let him in to go use the restroom, but that was the only time of all the occasions." Counsel did not clarify this reference. In rejecting all of defendant's claims of error, the trial court stated,

"Court took into consideration all of that, including *the defendant was entirely incredible [in] his relevant observations and recollections about contacts between the two* and found the victim or complaining witness was in fact credible and that there was no impeachment of such a nature that would undermine her credibility or believability.

And that's regardless of whether the initial sexual contact between her and the defendant was consensual or not. The Court did not resolve that question."

¶ 48 The court denied defendant's motion and later sentenced him to five years' imprisonment on count I only. On appeal, defendant raised a claim of sentencing error. We affirmed the judgment. *Tims*, 2013 IL App (2d) 120096-U.

¶ 49    In 2014, defendant filed a *pro se* petition under the Act. Among the petition's allegations was that his trial attorney failed to interview Zeigler. The petition alleged, without supporting exhibits or affidavits, that Zeigler had recorded A.S. stating during her interview:

> "MAY 31, 2011. IN THAT INCIDENT, THE DEFENDANT KNOCKED ON HER DOOR AND ASKED TO USE THE BATHROOM. THE DEFENDANT LET THE VICTIM IN."

Defendant commented:

> "Prior to an alleged sexual assault that occurred some two or three weeks before above date. Trial counsel did not take the claim serious [*sic*], refusing Deputy 418# [*sic*] Zeigler [*sic*] testimony."

¶ 50    The trial court advanced the petition to the next stage and appointed counsel for defendant. Counsel moved to withdraw. Addressing the claim we have just noted, counsel explained that the issue was patently frivolous. Counsel explained that Zeigler could have been called for impeachment purposes only and that any error in failing to call him was too insignificant to have affected the outcome of the trial. Counsel also noted that, although the testimony would have related to the alleged offense of May 31, 2011, the charge was not that defendant entered A.S.'s residence without her permission but that he refused to leave after she told him to leave.

¶ 51    The trial court granted the motion and *sua sponte* dismissed the petition. On appeal, we reversed and remanded. We held first that the trial court did not have the authority under the Act to dismiss the petition *sua sponte*. *People v. Tims*, 2017 IL App (2d) 150805-U, ¶ 30. Next, we held that the court abused its discretion in granting postconviction counsel's motion to withdraw. We explained that counsel's motion had insufficiently addressed several of the petition's claims, including that trial counsel was ineffective for failing to interview two unspecified alibi witnesses.

*Id.* ¶¶ 38-40. Concerning defendant's claim that counsel was ineffective for failing to interview Zeigler—we held that counsel satisfied the threshold for obtaining leave to withdraw. *Id.* ¶ 41.

¶ 52 On remand, defendant was appointed new attorneys. They moved to withdraw, stating that there were no nonfrivolous issues to pursue. Defendant had told them that one of his two "alibi" witnesses was Zeigler, who would have testified that A.S. told him that, on May 31, 2011, she allowed defendant into her apartment. After reviewing the discovery in the case, the attorneys concluded that the Zeigler-based claim of ineffective assistance would fail because defendant could show neither unreasonable performance nor prejudice. It was irrelevant that, at the hearing on defendant's posttrial motion, his attorney mistakenly said that Zeigler's information had been elicited at trial. The trial court granted the motion to withdraw. Defendant did not amend the petition.

¶ 53 The State moved to dismiss defendant's petition. The State noted that defendant was required to make a substantial showing of a constitutional violation. See 725 ILCS 5/122-1(a)(1) (West 2020); *People v. Tate,* 2012 IL 112214, ¶ 10. The State argued that, insofar as the petition referred to the Zeigler issue, it did not support its claim with affidavits, records, or other evidence and did not state why such evidence was not attached to the petition. See 725 ILCS 5/122-2 (West 2020). The State argued that this defect was fatal to the claim.

¶ 54 The trial court dismissed the petition. Defendant appealed.

## II. ANALYSIS

¶ 55 On appeal, defendant contends that the trial court erred in dismissing his petition, because he made a substantial showing that his trial counsel was ineffective for failing to call Deputy Zeigler to testify that, on May 31, 2011, A.S. told him that she allowed him into her apartment. Defendant argues that trial counsel had no strategic reason to forgo calling Zeigler and apparently

did so out of inadvertence. He argues further that the impeaching evidence could have affected the trial court's view of A.S.'s credibility and thus might have changed the outcome of the case.

¶ 56    Defendant requests that we either reverse the judgment and remand for third-stage proceedings or hold that the petition states the gist of a meritorious claim and thus requires a remand for second-stage proceedings, including the appointment of new counsel.

¶ 57    We hold that the trial court properly decided that the petition failed to make a substantial showing of a constitutional violation. Therefore, we affirm the judgment. As the trial court already held that the petition stated the gist of a meritorious claim, that issue is not before us.

¶ 58    We review *de novo* the second-stage dismissal of a petition under the Act. *People v. Whitfield*, 217 Ill. 2d 177, 182 (2005). At the second stage of proceedings under the Act, the defendant must make a substantial showing of the violation of a constitutional right. *Tate*, 2012 IL 112214, ¶ 10.

¶ 59    Defendant's claim failed the "substantial showing" requirement, for two reasons. First, under section 122-2 of the Act, a petition "shall have attached thereto affidavits, records, or other evidence supporting its allegations or shall state why the same are not attached." 725 ILCS 5/122-2 (West 2020). This means that a claim that trial counsel failed to investigate and call a witness must be supported by an affidavit from the proposed witness. *People v. Enis*, 194 Ill. 2d 361, 380 (2000). Without an affidavit, "a reviewing court cannot determine whether the proposed witness could have provided testimony or information favorable to the defendant, and further review of the claim is unnecessary." *Id.* We note that this requirement applies even at the first stage of postconviction proceedings; the failure to attach the necessary supporting materials or explain their absence by itself justifies the summary dismissal of a *pro se* petition. See *People v. De Avila*, 333 Ill. App. 3d 321, 327 (2002).

¶ 60    Defendant's petition did not attach an affidavit from Zeigler or state why such an affidavit was not attached. The petition did not even attach the type of unsworn signed statement that was held inadequate in *De Avila* (see *id.*). Defendant contends that the absence of an affidavit was not fatal. He relies on two statements that defendants' attorneys on remand made in their motion to withdraw. The first was that they had reviewed the discovery in the case, including "a report detailing Deputy Zeigler's contact with [defendant and A.S.] on May 31, 2011." The second is that, at the hearing on defendant's motion for a new trial, his counsel "mistakenly Deputy Marotta's [*sic*] testimony with information in a police report authorized [*sic*] by Deputy Zeigler that was not elicited at trial." Defendant also notes that his trial counsel's cross-examination of Klockars and his erroneous statement at the hearing on defendant's motion for a new trial permit the inference that Zeigler would have testified as the postconviction petition represented.

¶ 61    Defendant does not explain how a third party's reference to what a purported witness wrote in a report satisfies the affidavit requirement of section 122-2. Defendant's petition relied on supporting information that was even further from compliance with section 122-2 than was the unsworn signed statement that was held inadequate in *De Avila* (see *id.*). Defendant also fails to explain how an attorney's cross-examination of a different witness or his implicit representation of what the purported witness would state under oath can satisfy section 122-2 and the clear language of *Enis*. The failure to satisfy section 122-2 fully supports the dismissal of the petition. Indeed, it would have supported summary dismissal in the initial period of consideration.

¶ 62    Although the section 122-2 violation alone requires affirmance, we also hold that, in any event, the petition did not make a substantial showing that trial counsel was ineffective for failing to call Zeigler. To establish ineffective assistance of counsel, a defendant must show that (1) counsel's performance was objectively unreasonable and (2) it is reasonably probable that, but

for counsel's errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984); *People v. Johnson*, 2013 IL App (2d) 110535, ¶¶ 41, 57. We conclude that defendant's petition did not make a substantial showing on the prejudice prong of *Strickland*. Indeed, the record decisively refutes any suggestion that the introduction of Zeigler's purported testimony had a realistic chance of producing a different outcome. This is manifest from both the trial court's explanation of its finding of guilt and the evidence that strongly supported that finding.

¶ 63    Defendant contends that, because the trial court recognized that this case came down to a credibility contest, the evidence was therefore closely balanced. It is true, as defendant notes, that "[i]n determining whether the evidence adduced at trial was close, a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *People v. Sebby*, 2017 IL 119445, ¶ 53. Thus, when the parties present two credible but opposed versions of an event, and no extrinsic evidence is presented to corroborate or contradict either version, the case comes down to a credibility contest and can be described as closely balanced. *Id.* ¶ 63. However, as we have noted, there is no credibility contest "when one party's version of the events was either implausible or corroborated by other evidence. " *People v. Olla*, 2018 IL App (2d) 160118, ¶ 35. That is the situation here.

¶ 64    The trial court concluded that, despite some inconsistencies or inaccuracies, the State's version of the events at issue was credible. The court also noted that A.S.'s testimony was strongly corroborated by the several deputies who not only testified consistently with her about the dates of the incidents at issue but also testified that she was upset and shaken, as someone who had been the victim of stalking would be. Moreover, although defendant contends that Zeigler's purported testimony that A.S. allowed defendant to enter her apartment on May 31, 2011, would have cast

doubt on whether the earlier sexual assault had occurred, the trial court specifically stated that it was not resolving whether the mid-May sexual activity had been consensual or nonconsensual; either way, the evidence proved defendant guilty of the acts that occurred between May 31, 2011, and July 31, 2011. Thus, the court implied that, even were A.S. mistaken or untruthful about what happened before May 31, 2011, it would have found defendant guilty as charged. The alleged impeachment would not have affected the outcome, even assuming that there were no serious infirmities in defendant's evidence.

¶ 65    Serious infirmities, however, abounded in defendant's evidence. We need not discuss Massie's testimony, which the trial court did not discredit but found wholly inconclusive as to one of four acts that each independently supported a finding of guilt. The court *did* discredit defendant's versions of the events at issue. Indeed, the court stated that "*no reasonable person*" could conclude that defendant had an ongoing relationship with A.S. and that defendant was "*entirely incredible* [in] his relevant observations and recollections of contacts between [himself and A.S.]." (Emphases added.) The court's conclusion that this was an entirely one-sided credibility contest was well supported by the testimony—defendant's as well as the State's.

¶ 66    We begin with defendant's account of his encounters with A.S. before she contacted the police about him.

¶ 67    On direct examination, he testified that the first such encounter occurred around "the end of May," the second occurred sometime in May, and the third occurred around or just past Mother's Day, which, as the prosecutor later noted, was May 8, 2011. Thus, according to defendant, his third encounter with A.S. long predated the first two. On cross-examination, defendant placed the first encounter (whether sexual or casual is unclear) on Mother's Day—or maybe sometime around then—but not necessarily in either the first or second week in May.

¶ 68    On direct examination, defendant also ignored the May 31, 2011, incident, at least insofar as A.S.'s call to the police was concerned.  He did not mention that date and, as noted, testified only that there were three consensual encounters (sexual or otherwise) sometime in May.  These included the time when, according to him, he dropped by a party to which he had not been invited and a total stranger asked him (not one of her friends) to procure jumper cables, which A.S. then kindly gave him.

¶ 69    Defendant was similarly inconsistent on cross-examination about the May 31, 2011, encounter.  He testified that there was an incident in which he entered A.S.'s apartment, carrying a McDonald's bag, and she told him to leave.  He testified further that the police spoke to him that evening and told him to leave A.S. alone.  This much was consistent with the State's evidence of what happened on May 31, 2011.  However, defendant testified that the encounter took place exactly two days after a consensual encounter that occurred sometime in June.

¶ 70    Defendant got into further difficulties on this matter.  The prosecutor asked him about the incident involving the McDonald's bag, noting that it occurred on May 31, 2011.  Defendant initially said that he did not remember what happened on that date and asked the prosecutor for help in remembering an incident in which the prosecutor was not involved but he was.  The prosecutor declined to be of assistance, and defendant stated that he spoke to Klockars on the date that A.S. first called the police—which, he conceded, might have been May 31, 2011.  Asked further about the events of May 31, 2011, defendant initially testified that he did not recall entering A.S.'s apartment with a McDonald's bag, but then testified that he "kn[e]w for a fact" that he entered her apartment with a McDonald's bag.  Aside from being self-contradictory, defendant's testimony also contradicted his testimony on direct examination that A.S. did not call the police until sometime in June.

¶ 71     On direct examination, defendant testified that his fourth encounter with A.S. before she ever called the police occurred sometime in June. He did not recall the exact date, but he did narrow it down to either the beginning, middle, or end of the month. He did not recall the day of the week. He did remember, however, that it was exactly two days before A.S. called the police. On cross-examination, however, he admitted that on June 2, 2011, Marotta told him to leave A.S. alone, contradicting his assertion that A.S. first called the police two days before an encounter that happened sometime between June 1, 2011, and June 30, 2011.

¶ 72     On direct examination, defendant testified that the incident with the card and gifts occurred in late June or early July. This was consistent with his soon-to-be-discredited account of the incident involving the McDonald's bag. However, it contradicted A.S.'s testimony that she was out of the country in late June and early July. On cross-examination, confronted with the contradiction, defendant denied that A.S. had been away during that period, but he could not give the date of the encounter—except that it was the day before A.S. called the police.

¶ 73     Aside from the foregoing, defendant conceded that, when the deputies confronted him about his contacts with A.S., he did no more than hint that they had a relationship of some sort and never clarified the statement, much less mention any consensual sexual activity. He testified that he did not consider this matter relevant. The trial court properly discredited any implication that, after May 31, 2011, A.S. and defendant were even friends.

¶ 74     In sum, even aside from the petition's lack of proper supporting evidence, defendant cannot show prejudice from counsel's failure to call Zeigler. Therefore, he did not make a substantial showing of ineffective assistance counsel, and the trial court properly dismissed the petition.

¶ 75                                             III. CONCLUSION

¶ 76     For the reasons stated, we affirm the judgment of the circuit court of Du Page County.

¶ 77     Affirmed.